UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | |
| v. | * | Criminal No. 05-10326-JLT |
| | * | |
| TYSON FORD, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM

July 20, 2006

TAURO, J.

Defendant Tyson J. Ford is charged with being a convicted felon in possession of a firearm.[1] Defendant has moved to suppress the firearm seized by Officers Daran Edwards and Daniel Griffin of the Boston Police Department and to suppress certain statements that Defendant made to the officers. For the following reasons, Defendant's Motion to Suppress is DENIED.

**Background**

On September 8, 2005, Boston Police Department ("BPD") Officers Daran Edwards ("Edwards") and Daniel Griffin ("Griffin") were on routine patrol in the Dorchester section of Boston, Massachusetts. Both officers were in uniform and driving a marked Boston police

---

[1] See 18 U.S.C. § 922(g)(1) ("It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . [to] possess in or affecting interstate commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.").

cruiser.[2]  Around 3:00 p.m. in the afternoon, the officers drove towards the intersection of Harvard Street and Gleason Street in Dorchester.  The BPD has deemed this neighborhood a "hot spot" for criminal activity.  The neighborhood has a high rate of firearm arrests, violent crime arrests, drug arrests, gang activity, and "shots fired" incidents.  Officers Edwards and Griffin regularly patrolled this area and were familiar with most of the residents of the neighborhood.

As Officers Edwards and Griffin approached the Harvard-Gleason area, they observed Defendant walking alone down Harvard Street towards Gleason Street.  Neither Officer Edwards or Officer Griffin recognized Defendant.  Defendant, looking over his shoulder, observed the officers' police cruiser traveling in his direction.  Defendant immediately looked down, sped up, and then quickly changed his direction, turning off of Harvard Street and on to Gleason Street.  The officers, still in their marked cruiser, followed Defendant on to Gleason Street and pulled the cruiser to the curb alongside Defendant in order to conduct a Field Intelligence and Observation Report ("FIO").[3]  The officers did not physically block Defendant's path.

Officer Griffin leaned out of the cruiser's passenger side window and asked Defendant "[c]an I speak to you for a minute?"  Defendant stopped walking, took his identification out of his front pocket, and voluntarily handed his identification to Officer Griffin.  Defendant then told the officers that he had no outstanding warrants and that he was not on probation.  Officer Edwards took Defendant's identification and initiated a search of the BPD computer database to determine

---

[2] A "marked cruiser" is a police vehicle labeled on both sides with "Boston Police Department" and which is equipped with a siren and flashing blue lights.

[3] An FIO is routinely compiled by patrol officers, during which the officers record a person's name, nickname, address, date of birth, social security number, physical characteristics, and other relevant information.  Compliance with an officer's request for FIO information is voluntary.  See United States v. Smith, 423 F.3d 25, 27 n.1 (1st Cir. 2005).

whether Defendant had any outstanding warrants. While Officer Edwards waited for the results of the search, Officer Griffin continued to ask Defendant various routine questions, such as "[w]here do you live?" and "[w]here are you headed?" During this brief interaction, the officers observed Defendant's rapid breath, stuttered words, and trembling hands. Although Defendant answered all of Officer Griffin's questions, the officers described Defendant as annoyed, hostile, and, on the basis of the abovementioned observations, extremely nervous. Officer Griffin then asked Defendant "[d]o you have anything on you we need to know about?" Defendant replied "no."

Officer Griffin then exited the cruiser to complete the FIO. Officer Edwards also exited, walked around the back of the car and approached Defendant from the same side as Officer Griffin. Defendant, at this point, began shaking more severely and raised his hands above his head, asking "[c]ome on man, what's this all about?" Officer Griffin again asked Defendant whether he had any weapons on him. Defendant answered "[y]eah, I got a gun in my pocket, but it don't fire." Officers Edwards and Griffin then placed Defendant in handcuffs and Officer Griffin frisked him. Officer Griffin discovered and seized a Grendel, Inc., P-12 .380 semi-automatic handgun from the pocket of Defendant's pants. The officers then arrested Defendant. The firearm was not loaded and subsequent testing confirmed that the firearm was in fact inoperable.[4]

The entire encounter between the officers and Defendant lasted approximately two to three minutes. Neither officer physically touched Defendant before placing him in handcuffs, neither officer drew his weapon, and neither officer told Defendant that he was not free to leave.

---

[4] Although the firearm was inoperable, the firearm seized from Defendant satisfies the requirements of 18 U.S.C. § 922.

The officers, furthermore, never activated the police cruiser's siren or its flashing blue lights.

On August 18, 2005, the BPD posted a message on the BPD internal intranet "weblog" bulletin stating that Defendant may be in possession of a .380 caliber handgun. All Boston Police Officers had access to this bulletin through computers in the Boston Police Stations. Officer Edwards saw this bulletin at some point before his September 8, 2005 encounter with Defendant. Officer Edwards testified, however, that he did not remember the bulletin at any time before or during the encounter with Defendant.

## Discussion

The issues presented by Defendant's motion are two-fold. The first issue is whether Officers Griffin and Edwards seized Defendant before he made the incriminating statement and before they seized the firearm. The second issue depends upon the resolution of the first – that is, whether the officers, if they did seize Defendant, had sufficient reasonable suspicion to justify the seizure under the Fourth Amendment to the United States Constitution.[5]

The Fourth Amendment protects all people against unreasonable searches and seizures.[6] The Fourth Amendment, however, is not implicated every time a police officer encounters a citizen in a public place.[7] In fact, "'[t]here is nothing in the Constitution which prevents a

---

[5] See, e.g., Terry v. Ohio, 392 U.S. 1, 27-28 (1968) (holding that reasonable suspicion of criminal activity is sufficient to justify a brief investigatory stop).

[6] U.S. Const. Amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").

[7] See Smith, 423 F.3d at 28 ("While the Fourth Amendment protects against unreasonable searches and seizures, not all encounters between law enforcement officers and citizens constitute seizures.").

policeman from addressing questions to anyone on the streets.'"[8] "'Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.'"[9]

The hallmark of a Fourth Amendment seizure is coercion.[10] A police-citizen encounter rises to the level of a seizure when the interaction is compelled by physical restraint or a non-physical show of authority, rather than by the citizen's voluntary compliance.[11] A certain degree of compulsion is inherent when a law enforcement officer confronts someone with questions.[12] Courts, therefore, apply an objective standard to determine whether an encounter was sufficiently coerced to rise to the level of a seizure.[13] That standard is that "[n]o seizure occurs when officers approach a citizen to ask a question unless it was objectively reasonable for that person to believe that he was compelled to stay and answer the question."[14] Stated another way, a seizure occurs only when the totality of the circumstances illustrates that a reasonable person would not have felt

---

[8] United States v. Mendenhall, 446 U.S. 544, 553 (1980) (quoting Terry, 392 U.S. at 34 (White, J., concurring)); see also Smith, 423 F.3d at 28; United States v. Young, 105 F.3d 1, 5-6 (1st Cir. 1997) ("Police may approach citizens in public spaces and ask them questions without triggering the protection of the Fourth Amendment.").

[9] Smith, 423 F.3d at 28 (quoting United States v. Drayton, 536 U.S. 194, 200-01 (2002)).

[10] Id.

[11] Id.

[12] Id. ("[S]ince most tend to feel some degree of compulsion when confronted by law enforcement officers asking questions, such discomfort cannot be the measure of a Fourth Amendment seizure.").

[13] Id. (citing Mendenhall, 446 U.S. at 553).

[14] Id. (citing Mendenhall, 446 U.S. at 553).

free to terminate the conversation and leave the encounter.[15]

The United States Supreme Court has designated several factors to guide a court's evaluation of whether a seizure occurred in a given situation.[16] Factors that might elevate a police encounter from a voluntary conversation to a seizure include the threatening presence of several officers, the display of the officers' weapons, any physical touching of the defendant, and the use of language or tone of voice that indicates that compliance with the officers' request is not discretionary.[17] These factors are not exclusive, however, and no single factor is dispositive.[18] Courts, instead, will examine all of the facts surrounding a particular situation to determine whether a reasonable person would have felt free to leave.[19]

The First Circuit Court of Appeals has considered facts similar to the present case in two cases which serve as useful guides in the resolution of the instant motion.[20] In United States v. Young, two Boston Police officers on patrol in a marked cruiser observed three men, who were standing together, quickly disperse upon seeing the police cruiser.[21] The officers noted that the defendant matched the description of a suspect in a robbery that occurred in the area.[22] The

---

[15] See id. at 28-29 (citing INS v. Delgado, 466 U.S. 210, 216 (1984)); Young, 105 F.3d at 6 (citing Florida v. Bostick, 501 U.S. 429, 439 (1991)).

[16] Smith, 423 F.3d at 29 (citing Mendenhall, 446 U.S. at 554-55).

[17] Id. (citing Mendenhall, 446, U.S. at 554).

[18] Id.

[19] See id. (citing Bostick, 501 U.S. at 439).

[20] See id. at 26-32; Young, 105 F.3d at 4-8.

[21] Young, 105 F.3d at 4.

[22] Id. at 5.

officers followed the defendant, pulled their cruiser to the curb alongside him, and stated "Boston Police, you got a minute?"[23] The defendant replied "[s]ure" and stepped towards the cruiser.[24] The First Circuit held that the officers did not seize the defendant and that the encounter, up to that point, did not trigger the protections of the Fourth Amendment.[25] The court explained that "in the absence of an officer's exertion of physical force or an individual's submission to a show of authority, no seizure occurs."[26]

In United States v. Smith, two Boston Police officers were on patrol in a marked Boston police cruiser when they noticed the defendant, Smith, sitting on a small wall behind a telephone pole.[27] A chain link fence stood directly behind the defendant.[28] Both officers regularly patrolled this area and were familiar with the local residents.[29] Neither officer recognized the defendant.[30] One of the officers leaned outside of the cruiser's passenger side window and asked the defendant

---

[23] Id.

[24] Id.

[25] Id. at 6. In this case, the Government conceded that a Fourth Amendment seizure occurred when one of the officers lunged at the defendant, after observing a handgun in the defendant's waistband, and made brief contact with the defendant's jacket. See id.

[26] Id. (citing United States v. Sealey, 30 F.3d 7, 10 (1st Cir. 1994) (finding no seizure occurred where police officers in a cruiser simply approached defendant and yelled "Hey Steven, what's up?")).

[27] 423 F.3d at 26.

[28] Id. at 26-27.

[29] Id. at 27.

[30] Id.

whether he lived at the house behind him.[31] The defendant stated that he did not live there.[32] After a few more questions, the officers exited their cruiser and approached the defendant to complete a FIO.[33] The officers stood on either side of the telephone pole that was directly in front of the defendant.[34] The officers asked the defendant for his identification, which the defendant produced.[35] Then, as one of the officers started back to the cruiser to run the defendant's name through the police database, the defendant stated that he had an outstanding warrant.[36] After a brief scuffle, the officers then arrested the defendant and found a firearm in his possession.[37]

The issue in Smith, as in the instant case, was whether the defendant was seized before he admitted to the outstanding warrant.[38] On these facts, the First Circuit held that the officers did not seize the defendant prior to his arrest.[39] Particularly relevant to the court's holding were the facts that the officers did not activate the cruiser's sirens or lights, they did not affirmatively summon the defendant to the cruiser, they did not draw their weapons, they never physically restrained or touched the defendant, they did not accuse the defendant of committing a crime,

---

[31] Id.

[32] Id.

[33] Id.

[34] Id.

[35] Id.

[36] Id.

[37] Id.

[38] Id. at 29.

[39] Id. at 30.

they did not question the defendant about any specific event, and their questions were "general and non-threatening."[40] The court also found that although the officers effectively blocked the defendant's movement by standing on either side of the telephone pole, the officers' positioning was the only place the officers could have stood to speak with the defendant.[41] The court explained that "even if the pole and the wall created the illusion of being restrained, it must be remembered that mere physical limitations on an individual's movement, not created by police, are insufficient to turn an encounter with police into a restraint of liberty."[42] The court, therefore, found that "under all the circumstances of this encounter, an objectively reasonable person would have felt free to decline the officers' requests or otherwise terminate this encounter."[43]

In the present case, Officers Edwards and Griffin pulled their cruiser along side of Defendant and asked him if they could speak to him. Defendant stopped walking, turned to the police cruiser, and voluntarily produced his identification. Defendant voluntarily complied with the officers' request to talk and, therefore, the encounter to this point lacked any elements of objective coercion. Officers Edwards and Griffin did not activate their cruiser's lights or siren, they did not exit the cruiser, they did not draw their weapons, they did not accuse or question Defendant regarding any crime or specific event, their question, "[c]an I speak to you for a

---

[40] Id. at 30 ("When they exited their car, the officers merely approached Smith requesting his identification, or even just his name. Such a non-threatening request does not elevate an otherwise consensual encounter between a citizen and the police into a seizure.").

[41] See id.

[42] See id. at 30-31 ("When the freedom of movement of a person is limited by a physical obstruction not created by the police, the correct test for seizure is not 'free to leave,' but free to terminate the encounter by refusing to answer questions.") (citing Bostick, 501 U.S. at 436).

[43] Id. at 31.

minute," was general and non-threatening, and the officers did not physically restrain or block Defendant's movement. The most important factor, of course, is that Defendant voluntarily stopped walking and voluntarily produced his identification.[44] On these facts, as in Young, an objectively reasonable person would have felt free to terminate the encounter or refuse to answer the officers' question.[45] This initial interaction between the officers and Defendant, therefore, did not rise to the level of a Fourth Amendment seizure.

The next question is whether Officers Edwards and Griffin seized Defendant when they exited the police cruiser and approached Defendant, before he admitted to possessing the firearm. Officers Edwards and Griffin exited their vehicle to complete the FIO after observing Defendant's extreme nervousness. Both officers approached Defendant from the same side, both facing Defendant, and merely asked him whether Defendant had anything in his possession that the officers should know about. Neither officer drew his weapon, physically touched Defendant, or verbally threatened or accused Defendant of anything. The officers here, unlike in the Smith case, did not physically block Defendant's ability to walk away. The officers approached Defendant, asked one simple question, and Defendant immediately admitted to having a firearm in his possession. This encounter exhibits none of the objective factors that traditionally raise police encounters to the level of a seizure which implicates the Fourth Amendment.[46]

Defendant argues that he was seized because Officers Edwards and Griffin retained his

---

[44] See id. at 29 (explaining that simply because someone responds to a police request it does not follow that a seizure occurs).

[45] See Young, 105 F.3d at 6.

[46] See Smith, 423 F.3d at 30-31 (finding that no seizure occurred in a case with facts similar to the case herein considered).

identification throughout the entire encounter.  The United States Supreme Court has suggested that the retention of a suspect's identification is one factor that weighs in favor of finding a seizure.[47]  In Florida v. Royer, the Court held that:

> [W]hen the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.  These circumstances surely amount to a show of official authority such that "a reasonable person would have believed he was not free to leave."[48]

The facts in this case, however, are quite different from those presented in Royer.   In Royer, two narcotics officers approached Royer, affirmatively requested Royer's driver's license and ticket, asked Royer specific questions regarding his suspicious conduct, accused Royer of transporting narcotics, and asked Royer to accompany the officers to a police interrogation room.[49]  The encounter in Royer occurred fairly slowly and over several minutes.  The officers in Royer did retain Royer's driver's license, but that fact was merely one factor, among many, that made the encounter a seizure.[50]

Officers Edwards and Griffin did retain possession of Defendant's identification throughout the encounter, including the time when the officers exited the cruiser and approached Defendant.  The entire encounter, however, occurred very quickly.  Officer Edwards testified that approximately two to three minutes passed between the officers' initial contact with Defendant

---

[47] Florida v. Royer, 460 U.S. 491, 501-02 (1983).

[48] Id. (citing Mendenhall, 446 U.S. at 554).

[49] See id. at 501.

[50] See id. at 501-02.

and Defendant's statement regarding the firearm. Officer Edwards, furthermore, retained Defendant's identification for the purpose of searching the BPD's computer database to determine whether Defendant had any outstanding warrants. Both officers, however, exited the cruiser before Officer Edwards completed the computer search. In short, the encounter happened so quickly that Officers Edwards and Griffin never had an opportunity to return Defendant's identification to him. The most important fact, furthermore, is that Defendant voluntarily gave the officers his identification without any request by the officers. The retention of Defendant's identification in this case does not convert this otherwise consensual encounter into a Fourth Amendment seizure.

This court finds that under all the circumstances presented in this case an objectively reasonable person would have felt free to terminate the encounter with Officers Edwards and Griffin. The traditional objective factors that indicate coercion and characterize a seizure are absent from this case. Defendant voluntarily responded to the officers' initial inquiry, voluntarily produced his identification, and without coercion admitted to possessing a firearm.

> "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." Although a person may regret staying to answer an officer's questions . . . such regret does not transform an otherwise consensual encounter into an unconstitutional seizure.[51]

The encounter between the two officers and Defendant simply did not rise to the level of a Fourth Amendment seizure. Defendant, therefore, was not seized prior to making the incriminating statement regarding his possession of the firearm.

The officers, once hearing Defendant's statement, had sufficient probable cause to search

---

[51] Smith, 423 F.3d at 29 (quoting Delgado, 466 U.S. at 216).

and arrest Defendant, which they proceeded to do. The officers properly searched Defendant with probable cause and incident to the lawful arrest, during which the officers discovered the firearm in question and seized it.[52] The conduct of Officers Edwards and Griffin, therefore, did not violate the Constitution at any time during their encounter with Defendant. This court, having decided that a seizure did not occur, need not consider or determine whether Officers Edwards and Griffin had sufficient reasonable suspicion or probable cause to initiate their encounter with Defendant.

## Conclusion

For the reasons stated above, the encounter between the two Boston Police officers and Defendant did not rise to the level of a Fourth Amendment seizure. Defendant's incriminating statement occurred during a consensual encounter with police and was not the product of a seizure. As a result of that statement, the officers had sufficient probable cause to arrest and to search Defendant. Defendant's Motion to Suppress is DENIED.

AN ORDER WILL ISSUE.

    /s/ Joseph L. Tauro
United States District Judge

---

[52] See, e.g., Chimel v. California, 395 U.S. 752, 762-63 (1969) ("When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or to effect his escape. . . . In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.").